(Nos. 88-CC-0946, 87-CC-1000 cons.—
ALL STATES PAINTING, INC., Claimant, *v.*
THE STATE OF ILLINOIS, Respondent.

*Opinion filed June 18, 1991.*

BELLATTI, FAY, BELLATTI, BEARD & CARPENTER, for Claimant.

ROLAND W. BURRIS, Attorney General (GREGORY RIDDLE, Assistant Attorney General, of counsel), for Respondent.

## OPINION

Montana, C.J.

Claimant All States Painting, Inc. (hereinafter referred to as All States) brought these claims seeking payment for work performed pursuant to a contract with the Respondent's Capital Development Board (hereinafter referred to as the CDB). The claims were initially filed on standard lapsed appropriation form complaints. The allegations were, *inter alia*, that demands for payments were made to the CDB and that the demands were refused on the grounds that the funds appropriated for the payments had lapsed. As the cases developed it became clear that much more than lapsed appropriations were involved. The cases were assigned to a commissioner and consolidated. A hearing was held, briefs were filed, the commissioner has made his report, and the case is now before us for decision on the merits.

The facts are for the most part undisputed. On March 24, 1986, All States responded to an invitation by the CDB to submit bids for the rehabilitation of a

500,000 gallon elevated water tower located at the Jacksonville Developmental Center in Jacksonville, Illinois.

The bidding documents provided for the bidder to quote a price for "General/Painting Work" and also asked bidders to quote a unit price for doing electric fusion pit-welding, the unit price to be stated in terms of the bidders' price for doing units of 50 pit-welds. The base bid included welding 300 pits.

All States' bid was $36,000.00 for the base and a unit price of $350.00 for each 50 pits. On May 21, 1986, CDB sent All States a notice of award stating that its bid was accepted. This document showed the contract amount as $36,000.00 and made no reference to the unit price portion of All States' bid. In this document, as was true with the bidding documents, All States was warned that all work "shall be completed * * * no later than September 1, 1986." All States on that same date signed a contract which provided for a contract amount of $36,000.00 and left blank the area following the phrase, "the following alternate bids, unit prices and material substitutions have been accepted and are incorporated in this contract." However, the project manual, which was incorporated into the contract by reference, stated "All pits on waterside surfaces of bowl, shell and riser cylinder shall be filled with weld metal by electric fusion welding process. This shall include all pits 1/8 inch or deeper."

A "pit" is an area one inch square on the inside of the elevated water tank that has become so corroded that it must be repaired so that after the tank has been repainted debris will not adhere to it. Pit-welding consists of filling these pits so that the metal of the tank is restored to its original thickness.

According to the Claimant, before any pit-welding could be done the interior of the tank had to be sandblasted to remove loose particles and to clean the tank down to the bare metal. The Claimant also stated that when the interior of a tank is badly corroded and a substantial amount of pit-welding is needed, the initial sandblasting takes three times as long as it does if the inside of the tank is smooth.

It was only after the initial sandblasting was complete that it could be determined how extensive was the need for pit-welding. Prior to that there was no way of knowing how many pits would require welding. It was ultimately agreed that 18,350 pits required welding, 18,050 (316 units of 50 pits each) more than what were included in the base bid.

After the pit-welding was completed, it was necessary to sandblast the interior of the tank again in order to smooth the surface. The presence of the pit-welds, which make the surface quite uneven, causes this sandblasting to take four times as long as would be the case on a smooth surface. Only then was the interior ready for the two coats of paint called for in the specifications. The necessity of pit-welding thus resulted in a substantial labor cost to Claimant, over and above what would have been required otherwise, not only for the sandblasting, but also in providing men on site while the welding was going on in order to comply with safety regulations. The pit-welding work, which was done by All States' subcontractor, Birdco Fabricators, took 28 days to complete, using three men.

All States began its work on the tower soon after July 10, 1986. By August 8, 1986, the subcontractor had completed a substantial portion of the pit-welding work. Bernie McCabe, project manager for CDB was on the

site approximately three times a week during performance of the job. However, at no time did he ask or demand that All States stop the pit-welding in order to get a change order approved. Indeed, Mr. McCabe stated to both the subcontractor, Everett Birdsell, and to All States' vice president and job superintendent, Michael Desyllas, that the pit-welding was being done under the unit price of $350.00 per 50 pits and that All States should go ahead with the work. Mr. McCabe, who was the only CDB representative with whom All States had contact during this project, made this statement to Mr. Birdsell close to completion of the pit-welding work. Also, two men from the CDB, described by the Respondent as engineers and investigators, came to the site while the pit-welding was ongoing in order to inspect the condition of the interior and determine the amount of pit-welding required. Again, no stop work order was given after this inspection, and the pit-welding was continued to completion.

In fact, it was not until August 18, 1986, when the pit-welding was virtually completed, that All States was informed that its unit price bid had not been accepted. Patricia Desyllas, president of All States, testified that the company would never have signed the contract if it had known that the CDB was attempting to accept only a part of its bid.

On September 2, 1986, John Evans of CDB wrote to All States asking for its cost breakdown in welding the pits. On September 17, 1986, All States submitted its invoice-voucher requesting payment of $162,350.00 being the amount of its base bid and welding of 18,050 pits at $350.00 per 50 pits. However, these documents were returned to All States in mid-October.

Thereafter, without the knowledge of All States, CDB contacted Birdco Fabricators, the subcontractor,

and asked for its costs involved in the pit-welding so that a change order could be prepared. The subcontractor's information was placed on a form used to start the change order process. The change order document itself was prepared December 15, 1986, and ultimately was approved by CDB on March 20, 1987. This change order in the amount of $32,248.87, was based solely on the subcontractor's costs in doing the pit-welding; other than the subcontractor costs, none of All States' costs were figured into the change order. During the three months that this change order request was pending, no one from CDB notified All States that this process was going on or asked for All States' costs involved in the pit-welding. All States had no knowledge that this process was taking place. CDB was interested in getting its paperwork finished and closing its file.

Relying upon advice of counsel, All States did not submit a request for change order in the Fall of 1986 because it believed the unit prices to be a part of the written contract and because the project was not finished anyway. However, on February 24, 1987 (approximately a month before the change order for $32,248.87 was approved by CDB), All States did submit a cost breakdown and request but the CDB made no reply to it.

Patricia and Michael Desyllas presented uncontroverted evidence at trial of All States' actual added expenses caused by the necessity of the pit welding work:

| | |
|---|---|
| Labor | $27,510.00 |
| Worker's compensation | 22,041.97 |
| Employment taxes | 5,018.77 |
| Liability insurance | 4,956.82 |
| Subcontractor | 27,075.00 |

| Pension and welfare | 3,851.40 |
| Bond | 1,814.40 |
| Equipment rental | 7,400.00 |
| Total | $99,668.36 |

Respondent in fact stipulated that these costs were true and accurate. John Evans, section manager for construction management of CDB, testified that it is CDB's practice, under its rules and regulations, to allow a contractor 15% for overhead and profit, over and above its actual expenses in doing extra work. CDB's general practice is that payment for extra work is based upon the contractor's actual expenses incurred in doing the work.

All States has received no payment from CDB for its work on this project and has filed two claims. The first claim seeks $32,400.00 for the amount of the base bid, less a 10% retainage. The second claim, as later amended, seeks $129,950.00, consisting of the $3,600.00 retainage and $126,350.00 for the extra pit welding work.

As the counsel for the Respondent stated in his brief, "Thus, the question before this Court is not whether or not money is owed to the Claimant, but rather how much." It is the CDB's position that $68,648.87 is owed. That sum, Respondent states, consists of the $36,000.00 base contract price less the 10% retainage and plus the $32,248.87 approved on the change order. (Respondent's brief, pages 2 and 17.) We do not understand this calculation. Also, why Respondent would disallow the retainage is unclear. A certificate of completion has been issued and there is no dispute that the Claimant completed the project satisfactorily and in accordance with the specifications.

The major issue in this case is whether or not the parties' contract called for the Claimant to perform the

361 units of pit welding not covered in the base contract. The terms of the contract are less than clear. Both sides made salient arguments as to their interpretations and positions. However, during the inception and performance of the contract there appears to have been a "meeting of the minds" or agreement as to the terms and it was not until after virtual completion and the unforeseeable variable of the number of units necessary to do the job became certain that the CDB raised the issue and sought to get out from under its obligations.

The actions of the parties are indicative of what was intended. The CDB sought to let no other contract on the job for the pit welding variable even though it had to know All States could not begin to do the painting which comprised the base bid until the welding was done and that All States had a September 1986, completion date. Three days a week the CDB's project manager was on the site and had continuous knowledge of the progress of the project and the increasing number of necessary pit welds. Two investigator/engineers from the CDB inspected the job as it progressed. The project manager acknowledged that the bid unit price would be paid. While these CDB agents may not have had authority to *agree* to the unit bid price, their knowledge of what was going on at the site can be imputed to their principal and their actions are at least evidence of what their principal's understanding of the terms of the contract was and what their principal had *previously agreed* to. They nor anyone else directed the Claimant to stop at any time. It was not until the pit welding job was virtually complete that the CDB sought to interject controversy and seek to have the Claimant go through the change order process.

Eventually the CDB apparently unilaterally issued a change order based solely on the subcontractor's costs.

The change order was issued a month after All States had submitted its costs. The Respondent stipulated to All States' costs at the hearing. Testimony at the hearing was that it was the CDB practice to allow cost plus 15% overhead and profit for "extra work." Yet the change order was issued for only about a third of the Claimant's costs.

The actions of the Claimant indicate that at all times it thought it had a contract containing the unit price, that its position was consistent with what it was led to believe was that of the CDB as evidenced by the actions of its project manager, and that it was willing to stand by its terms of the bargain.

We hold that the parties had a contract for both the base and unit price and we find that the Claimant has suffered damages for the breach of that contract totalling $162,350.00.

The matter of entering judgment remains. It is this Court's policy in breach of contract claims to limit awards so as not to exceed the amount of funds, appropriated and lapsed, with which payment could have been made. To do otherwise, i.e., to award money for debt incurred beyond the sum allotted by the General Assembly, would be tantamount to granting a deficiency appropriation. The appropriation of State funds is the constitutional prerogative of the General Assembly. It is the Court's duty to uphold that process. It is also the Court's duty to advise the General Assembly. (*Thorlief Larsen & Son, Inc. v. State* (1990), 42 Ill. Ct. Cl. 195; *Bojko v. State* (1988), 41 Ill. Ct. Cl. 202; *J.F. Inc. v. State* (1988), Ill. Ct. Cl. 5; *Loewenberg/Fitch Partnership v. State* (1986), 38 Ill. Ct. Cl. 227; *Ude, Inc. v. State* (1982), 35 Ill. Ct. Cl. 384.) In the case at bar insufficient funds lapsed to cover all of the Claimant's damages.

The Respondent filed a departmental report which was compiled by the CDB and offered as *prima facie* evidence of the facts contained therein pursuant to 74 Ill. Adm. Code 790.140. Although the Claimant did respond to the filing, it did not contest the fiscal data in the report. According to the report, at items 8, 9, and 10, the CDB lapsed $103,660.25 in the line item appropriation, No. 001-46125-6900-05-00, in fiscal year 1986, from which the payments on the contract were to have been made. This figure differs slightly from the $96,000.00 Respondent in its brief stated was the total appropriation. Respondent cited Claimant's exhibit 21 as the source. However, that exhibit is the recommendation to award contracts document and contains only estimates and projections. The departmental report is *prima facie* evidence. The report also states that no claims other than the ones at bar have been made against the lapsed balance. Therefore we will be constrained to award no more than $103,660.25.

In fulfilling our responsibility to advise the General Assembly and for purposes of possible further consideration of this claim by the General Assembly, we point out the following. Claimant suffered damages due to the breach of the contract totalling $58,689.75 in excess of the award to be given (the amount of the appropriation). Under the circumstances of this case, including the unforeseeable, the CDB could not adhere to the unit bid. After the total amount of necessary work was ascertained, there was a problem with a potential violation of a provision of the State Finance Act (Ill. Rev. Stat., ch. 127, par. 166), as alluded to in Respondent's brief. The amount we are constrained to award barely covers Claimant's actual costs for only the pit welding, leaving very little for profit and overhead on the pit welding and nothing for the base contract. But for the insufficient lapsed funds, an award of $162,350.00 would have been made.

It is hereby ordered that the Claimant be, and hereby is, awarded $103,660.25; the claim for interest is denied.